UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

JAMES M. PEDDY, II                          CIVIL ACTION NO.:  2:17-10556-SSV-JVM

VERSUS
                                            JUDGE: SARAH S. VANCE
QUALIS CARE OF LOUISIANA, LLC;
RECOVERY HOUSE OF EAST
TENNESSEE, LLC; AND                         MAGISTRATE: JANIS VAN MEERVELD
LUX MED HOLDINGS

## DEFENDANTS' STATEMENT OF
## MATERIAL FACTS THAT PRESENT NO GENUINE ISSUE

Defendants Qualis Care of Louisiana, LLC ("Qualis"), Recovery House of East Tennessee,

LLC ("Recovery House"), and Lux Med Holdings ("Lux Med") respectfully submit pursuant to

LR 56.1 this Statement of Material Facts That Present No Genuine Issue in support of their Motion

for Partial Summary Judgment (R. Doc. 112).

### I.      The Parties.

1.      Plaintiff James M. Peddy II ("Peddy") has resided in Louisiana since approximately

July 2017. Peddy Dep. (Ex. 1) at 56:4-5; Conner Dec. (R. Doc. 112-4) at ¶ 10.

2.      Between 2007 and late June 2017, Peddy resided in Las Vegas and was a citizen of

Nevada. Peddy Dep. (Ex. 1) at 38:15-16, 56:4; Neuman Dec. (R. Doc. 112-3) at ¶ 4.

3.      Defendant Lux Med is a "dba" name under which Capital Wealth Strategies, LLC

does business. Neuman Dep. (Ex. 2) at 23:16-19. It is a Wyoming limited liability company that

was formed on June 29, 2016. Articles of Incorporation (Ex. 3).

4.      Defendant Recovery House of East Tennessee, LLC is a Wyoming limited liability

company formed on May 11, 2016. Articles of Incorporation (Ex. 4).

5.      Defendant Qualis Care of Louisiana, LLC is a Wyoming limited liability company

that was formed on May 25, 2016. Wyoming Secretary of State Report (Ex. 5).

1647933.2

## II.     Ownership and Relationship Among Defendants.

6.     Lux Med, Recovery House, and Qualis are owned by Prestige Wealth Management, LLC ("Prestige"). Neuman Dec. (R. Doc. 112-3) at ¶ 1. Prestige is a Wyoming limited liability company that was formed on June 13, 2016. Wyoming Secretary of State Report (Ex. 6).

7.     Phil Neuman, a citizen of Nevada, is an entrepreneur who has been involved in a variety of businesses. Neuman Dep. (Ex. 2) at 22:23 – 23:25. He is the indirect owner of Prestige. *Id*. at 22:23 – 23:25; Neuman Dec. (R. Doc. 112-3) at ¶ 1.

8.     Neuman has experience in financial businesses in which a manager oversees investments made on behalf of investors. Neuman Dep. (R. Doc. 112-3) at 7:6-16, 8:11 – 9:3.

9.     In late 2015, Neuman started to consider investing in the behavioral health field, specifically in alcohol and drug rehabilitation facilities. Neuman Dec. (R. Doc. 112-3) at ¶ 2.

10.     Over the next few months, Neuman developed a business strategy of opening a series of facilities throughout the United States, with the goal of becoming one of the largest nationwide operators of such rehabilitation facilities. Neuman Dec. (R. Doc. 112-3) at ¶ 2; Neuman Dep. (Ex. 2) at 29:1-6.

11.     Neuman decided to structure the business in a similar way as his financial businesses, with a management company operating all of the facilities, but with each facility owned by a separate company. Neuman Dec. (R. Doc. 112-3) at ¶ 7.

12.     By the spring of 2016, Neuman decided to start the business by opening treatment facilities in Knoxville, Tennessee and New Orleans, Louisiana. Recovery House was formed to own the facility in Tennessee, Qualis was formed to own the facility in Louisiana, and Lux Med was formed as the management company. Neuman Dec. (R. Doc. 112-3) at ¶¶ 13.

13.     On April 1, 2016, Lux Med entered into Management and Consulting Services Agreements with Recovery House and Qualis. Neuman Dec. (R. Doc. 112-3) at ¶ 13; Lux Med-Recovery House Agreement (Ex. 7); Qualis-Lux Med Agreement (Ex. 8).

14.     The Management and Consulting Services Agreements provide that Recovery House and Qualis will compensate Lux Med with a monthly fee equal to $100 for each bed operated at the facility. Neuman Dec. (R. Doc. 112-3) at ¶ 14; Lux Med-Recovery House Agreement (Ex. 7) at Exhibit A; Qualis-Lux Med Agreement (Ex. 8) at Exhibit A.

15.     Because Neuman estimated that it would take approximately three years for the first two facilities to obtain the appropriate governmental licenses, start operations, and become profitable, the monthly fee payable to Lux Med commenced 36 months after the Management and Consulting Services Agreements were executed. Neuman Dec. (R. Doc. 112-3) at ¶ 15; Lux Med-Recovery House Agreement (Ex. 7) at Exhibit A; Qualis-Lux Med Agreement (Ex. 8) at Exhibit A.

16.     In order to finance the business during its start-up phase, Neuman arranged for another one of his businesses, FCCC, LLC, to enter into revolving credit lines and promissory notes with Lux Med, Recovery House, and Qualis. Neuman Dec. (R. Doc. 112-3) at ¶ 16; FCCC-Lux Med finance agreements (Ex. 9); FCCC-Recovery House finance agreements (Ex. 10): FCCC-Qualis finance agreements (Ex. 11).

### III.     Peddy's Qualifications and Prior Experience in Drug and Alcohol Treatment Facilities.

17.     After serving 20 years as a combat medic, Peddy retired from the Army and obtained a bachelor's degree in business and a master's degrees in business with a concentration in health care management. Peddy Dep. (Ex. 1) at 29:19 – 30:4, 31:8-9.

3

18.     Between November 2008 and 2014, Peddy worked as director of operations of operations for Desert Hope, a 143-bed drug and alcohol rehabilitation facility in Las Vegas managed by American Addiction Centers, one of the largest operators of such facilities. Peddy Dep. (Ex. 1) at 31:19-24, 46:7-11; 53:17-18; 95:21-24. Peddy was hired before Desert Hope became operational and he was responsible for overseeing governmental licensing and startup procedures. *Id*. at 53:5-11.

19.     In late 2013 or early 2014, Peddy was hired by another Las Vegas drug and alcohol treatment facility, Silver Rock, to become its operations manager. Peddy Dep. (Ex. 1) at 31:23 -- 32:3, 51:17-22. Like Desert Hope, Silver Rock hired Peddy before it became operational and Peddy was responsible for overseeing the governmental licensing process and the startup of operations. *Id*. at 52:10-22.

**D.     Peddy's Initial Ad Hoc Work for Neuman.**

20.     Because neither Neuman nor his business associates had previous experience in operating behavioral health facilities, Neuman knew that he needed an experienced executive to oversee the government licensing and operation of his contemplated behavioral health business. Neuman Dec. (R. Doc. 112-3) at ¶¶ 3, 9.

21.     In late 2015 a common acquaintance introduced Neuman to Peddy as someone with extensive experience managing alcohol and drug rehabilitation facilities in Las Vegas. Neuman Dec. (R. Doc. 112-3) at ¶ 4; Peddy Dep. (Ex. 1) at 60:6-15.

22.     Both Neuman and Peddy lived in Henderson, Nevada and they met several times at local restaurants to discuss Neuman's proposed business. Neuman Dec. (R. Doc. 112-3) at ¶ 4; Peddy Dec. (Ex. 1) at 61:4 – 65:5.

1647933.2

23.     Neuman was impressed with Peddy, especially his experience in overseeing the governmental approval process and startup phase of both Desert Hope and Silver Spring. Neuman Dec. (R. Doc. 112-3) at ¶ 5.

24.     Neuman initially asked Peddy to assist in several discrete projects, such as evaluating potential real estate that could be used facilities and advising on the governmental approval process. Peddy Dec. (Ex. 1) at 65:14 – 66:24; Neuman Dec. (R. Doc. 112-3) at ¶ 6. Peddy was paid flat fees for these services, which he performed while he was still employed at Silver Spring. Peddy Dec. (Ex. 1) at 66:25 – 68:7; Neuman Dec. (R. Doc. 112-3) at ¶ 6.

25.     After meeting Peddy, Neuman called Colin Conner, a business associate who had worked as CEO of several other Neuman-financed businesses, and invited Conner to meet Peddy and get involved in the new business. Neuman Dec. (R. Doc. 112-3) at ¶ 8. Conner was also impressed with Peddy and the prospects for the business, and he agreed to become involved as President of the contemplated management company. *Id*. at ¶ 9; Conner Dep. (R. Doc. 112-4) at ¶¶ 3-5.

**E.     Peddy's Profit-Sharing Agreement with Lux Med.**

26.     At a dinner meeting at Hank's steakhouse in Henderson, Nevada, Neuman offered Peddy the position of operations manager for the business. Peddy Dep. (Ex. 1) at 68:25 – 69:14; Neuman Dec. (R. Doc. 112-3) at ¶ 10. Peddy's compensation would be an profit interest in the management company, starting at 1% and increasing to 5% over five years, with a minimum monthly profit distribution. Peddy Dep. (Ex. 1) at 73:8-25; Neuman Dec. (R. Doc. 112-3) at ¶ 10.

27.     Peddy accepted the offer subject to discussing it with his domestic partner and agreement to the terms of a written contract. Peddy Dep. (Ex. 1) at 73:2-7; Neuman Dec. (R. Doc. 112-3) at ¶ 12.

5

28.     Conner drafted a written agreement and sent it to Peddy for review. Peddy Dep. (Ex. 1) at 77:5-8; Neuman Dec. (R. Doc. 112-3) at ¶ 12; Conner Dec. (R. Doc. 112-4) at ¶ 7. After discussing the contract with Conner, and Neuman, and his domestic partner, Peddy executed the agreement and sent it to Conner via email. Peddy Dep. (Ex. 1) at ¶¶ 79:1 -- 82:1; Neuman Dec. (R. Doc. 112-3) at ¶ 12; Agreement (Ex. 12) (the "Agreement").[1]

29.     Peddy executed the Agreement in Nevada, where he lived at the time. Peddy Dep. (Ex. 1) at 80:16-22, 110:18-25. Conner was in Florida, where he lives, when he sent the Agreement to Peddy and when Conner received the executed Agreement from Peddy a few days later. Conner Dec. (R. Doc. 112-4) at ¶ 8.

30.     Because the Agreement contemplates that Peddy would operate facilities throughout the United States, it does not make any reference to Tennessee or Louisiana, where the first two initial facilities were to be located, or to any other geographic location. Agreement (Ex. 12); Neuman Dec. (R. Doc. 112-3) at ¶ 19; Conner Dec. (R. Doc. 112-4) at ¶ 10.

31.     The Agreement includes a forum selection clause selecting New York law:

> The Agreement shall be construed in accordance with and governed by the internal laws of the State of New York.

Agreement (Ex. 12) at 2.

32.     Most contracts related to Neuman-financed projects include clauses selecting New York as the governing law because New York contract law is well developed, Neuman lived in New York for most of his life and he still spends a considerable amount of time there on a weekly basis. Neuman Dec. (R. Doc. 112-3) at ¶ 20.

---

[1] Although the agreement was executed in January 2016, "Jan 17, 2017" appears as a handwritten notation next to both Peddy's signature and Conner's signature. Agreement (Ex. 12) at 2. Mr. Conner does not recognize the signature that purports to be his. Conner Dec. (R. Doc. 112-4) at ¶ 8 n.1.

6

33.     At his deposition, Peddy conceded that he had read the Agreement and understood

all of its terms, including the choice of law provision:

> Q:     And when you signed the agreement, you agreed to be bound by the
>        agreement and the terms and conditions set forth in this two-page
>        document, correct?
>
> A:     Yes.
>
> Q:     Now, … on the second page it says, "This agreement shall be
>        construed in accordance with and governed by the internal laws of
>        the state of the New York. That is also part of the agreement that
>        you read and understood when you signed it on or about January,
>        [2016]?
>
> A:     Correct.

Peddy Dep. (Ex. 1) at 82:2-15.

34.     The Agreement describes Peddy as a "Consultant" and provides that his only

compensation will be an profit interest in Lux Med with guaranteed monthly profit distributions:

> For the performance of all of Consultant's services to be rendered to the
> terms of this Agreement, Company will cause a minimum *profit distribution*
> to be paid to the Consultant of $6000 USD/month for the first 4 months,
> $7000/month for the second 4 months and $9000/month thereafter. As of
> the 1st day of this agreement the *Consultant shall have a net profit interest
> in the company of 1% with a 1% increase in that interest each year for the
> next 4 years for a total net profit interest of 5% at the end of 5 years*. Upon
> sale of the company, consultants will participate in a minimum of 2% of the
> net profits of the sale. Any further profit distributions will be made quarterly
> at the discretion of the Company.

Agreement (Ex. 12) at 1.

35.     The Agreement provides for a 10-year term "unless earlier terminated pursuant to

terms and provisions of this Agreement." Agreement (Ex. 12) at 1. The Management and

Consulting Agreements that Lux Med executed with Recovery House and Qualis also provided

for a 10-year term because Neuman expected to develop this business over a 10-year period and

then sell it. Neuman Dec. (R. Doc. 112-3) at ¶ 17; Lux Med-Recovery House Agreement (Ex. 7)

7

at Exhibit A (36-month deferral of monthly payments then 84 months of payments for a total of

120 months or 10 years of payments); Qualis-Lux Med Agreement (Ex. 8) at Exhibit A (same).

36.     But the Agreement expressly provides that it may be terminated for cause and "if

termination is for cause or Consultant breaches this agreement, the profit interest shall be void."

Agreement (Ex. 12) at 1.

37.     And the Agreement also provides:

> If the Company terminates this agreement without cause all profit interest
> earned shall continue as above *accept [sic] for the minimum monthly
> distributions*.

Agreement (Ex. 12) at 1 (emphasis added).

38.     The Agreement also provides that Peddy has read its terms, understood them, and

expressly agreed to be bound by them:

> Consultant has read and is familiar with all of the terms and conditions of
> this Agreement and has the capacity to understand such terms conditions
> hereof. By executing the Agreement, Consultant agrees to be bound by this
> Agreement and the terms and conditions therefore.

Agreement (Ex. 12) at 2 (emphasis added).

39.     At his deposition, not only did Peddy concede that he had read the Agreement and

understood all of its terms, but he also understood that the Agreement provided that he could be

terminated before the 10-year term expired:

> Q:     I'm asking whether or not you knew – and I think you did because
> you are, obviously, a very intelligent man. You're able to read plain
> English. And it says right there in plain English that the termination
> date might be earlier than ten years if you were terminated under the
> terms of this contract. You knew that, didn't you?
>
> Plaintiff's counsel: Objection to Form.
>
> A:     I read the contract.

8

1647933.2

Q:     And you understood what I just said was true. You could be terminated before ten years?

A:     I understood what I read in on the contract, correct.

Peddy Dep. (Ex. 1) 106:17 -- 107:9.

**F.     Peddy's Termination.**

40.     On September 26, 2017, Lux Med terminated Peddy. Termination Letter (Ex. 13); Conner Dep. (R. Doc. 112-4) at ¶ 12; Peddy Dep. (Ex. 1) at 124:6-11.

41.     On October 4, 2017, Peddy sent an email to Conner demanding under La. R.S. 23:631 payment of $9,758.54, consisting of his pro-rata monthly guaranteed profit distribution through his termination date, $7,800, plus reimbursement for $1,958.54 in expenses, for a total of $9,758.58. Conner Dep. (R. Doc. 112-4) at ¶ 12; October 4, 2017 demand email (Ex. 14).

42.     On October 5, 2017, Peddy received payment in full of his demand. Conner Dec. (R. Doc. 112-4) at ¶ 13; four checks totaling $9,758.58 (Ex. 15).

43.     Peddy received 1099 tax statements reporting his monthly profit distributions and he always understood that he was providing services to Lux Med as an independent contractor. Conner Dec. (R. Doc. 112-4) at ¶ 14; Peddy Dep. (Ex. 1) at 200:11-14; Peddy's 2017 1099 form (Ex. 16).

Dated: May 13, 2019

Respectfully submitted,

Law Office of Kyle Sclafani
*Counsel for Defendants*

By:___ */s/ Kyle S. SclafaniI*___
        Kyle S. Sclafani (La. Bar Roll No. 28219)
4130 Canal Street
New Orleans, Louisiana 70119
Telephone: (504) 875-4079
kyle@kylesclafanilaw.com

1647933.2

THE GRIFFITH FIRM
*Counsel for Defendants*

By: _____/s/ Edward Griffith_____
       Edward Griffith (New York Bar No. 1949700)
45 Broadway, Suite 2200
New York, New York 10006
Telephone:  212-363-3784
Facsimile: 212-363-3790
Email: eg@thegriffithfirm.com

1647933.2